IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


JOHN WILLIAM SCHARNHORST, III                                    PLAINTIFF


v.                    Civil No. 5:22-CV-05218-TLB-CDC


CHIEF DEPUTY JAY CANTRELL, Washington County Detention Center (WCDC);
MAJOR RANDALL DENZER, WCDC; CPT. NOLAN AKE, WCDC;
CPT. KEVIN EAST, WCDC; LT. CARRIER; WCDC;
LT. M. ARNOLD; LT. A. ARNOLD; SGT. ALLEN, WCDC; SGT. PINEDA, WCDC;
SGT. MALONE, WCDC; SGT. WORKMAN, WCDC; SGT. BZOSKI, WCDC; SGT.
BRADSHAW, WCDC; SGT. FULLER, WCDC; SGT. BYRD, WCDC; CPL. CORLEY,
WCDC; CPL. BENJAMIN VELASCO, WCDC; CPL. MICHAEL SMITH; CPL. GORDON
OCHIENG, WCDC; CPL. TOM MULVANEY, WCDC; DEPUTY TATE, WCDC; SGT.
LUNSFORD; and SGT. SAM CAUDLE, in their individual capacities
                                                              DEFENDANTS


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff John William Scharnhorst, III, filed the above-captioned civil rights action pursuant to 42 U.S.C. § 1983.  Plaintiff proceeds *pro se* and *in forma pauperis*.  (ECF No. 5). Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3), U.S. District Judge Timothy L. Brooks referred this case to the undersigned for the purpose of making a Report and Recommendation on Defendants' Motion for Summary Judgment for Failure to Exhaust Administrative Remedies as to Defendant Bradshaw ("Motion for Summary Judgment on Exhaustion") (ECF No. 60) and Defendants' Motion for Summary Judgment on the merits. (ECF No. 68). Plaintiff has responded to both motions.  (ECF Nos. 66 & 77).  For the reasons outlined below, the undersigned recommends Defendants' Motions be granted with Plaintiff's claims against Defendant Bradshaw

1

dismissed without prejudice, and the claims against remaining defendants dismissed with prejudice.

## I.    BACKGROUND

After noting potential legal and factual deficiencies with Plaintiff's original complaint, Plaintiff was directed to file an amended complaint[1] which was filed on December 27, 2022. (ECF No. 8).  Plaintiff's Amended Complaint identified 47 defendants and asserted three (3) claims:

> (1) Defendant Sgt. Bzoski, aware of the conditions of ISO-4, ordered that Plaintiff be housed in ISO-4 from March 1, 2022, to March 5, 2022, without due process of law, because Plaintiff had spoken out against Defendant Helder.   Defendant Dfc. Schmitt carried out that order.   This cell was covered in black mold; there was "all sorts of feces and vomit on the walls, floor, ceiling, in the corners, on the bunk and around the sink/toilet fixture;" "swarms of flying insects were flying in and out" of the cell; "the ventilation system [in the cell] was not working and the tiny, musty, moldy, filthy, rancid cell got no fresh air."  (ECF No. 11, p. 6).   Defendants Cpl. A. Raines and Dfc. K. Martinez were aware of the conditions of his confinement, told him they would convey his concerns to Defendant Sgt. Allen and put in a work order for Defendant Caudle to address them, but sufficient repairs were not made. Defendants A. Raines and K. Martinez subsequently brought him his food tray, which "stirred up all the flying insects in the process."  (ECF No. 11, p. 6).   Defendant Allen also put in a work order to address these conditions but did not move him out of ISO-4.   Defendant Cpl. Caudle was responsible for maintaining the WCDC in good repair. Plaintiff was provided a rag to wipe down the cell, but the "paramount issues causing the ISO cells to be so disgusting is the large crevice in the floor which is filled with feces, vomit, rotting food, dead bugs, live bugs, bug larvae, hair, fingernails, etc. and the fact that it is a musty concrete box with a leaking fire sprinkler and no ventilation."  *Id.*, p. 7.   While the guards occasionally brought "cleaning supplies," those supplies consisted of a "push broom and wet mop, which smells like a wet dog and leaves long hairs

---

[1]    This Court does not endeavor to describe every docket entry in this case, only those relevant to the Court's consideration of the motions for summary judgment presently before it.

wherever it's [sic] used, and neither of these get into the corners, which are mounded with detritus." *Id.*

(2)  Defendant Captain Ake [2] ordered that Plaintiff be housed in isolation (ISO-1 and ISO-4) from March 29, 2022, to May 24, 2022, without due process of law, because he was writing letters to third parties and filing internal grievances about the conditions of his confinement at the Washington County Detention Center ("WCDC"). Plaintiff asserts that the Defendant Ake executed the order that was issued by Defendants Cantrell and Randall Denzer. According to Plaintiff, Defendants Sgt. Pineda, Sgt. Byrd, Sgt. Bradshaw, Dfc. Eoff, Dfc. Vasilopulos, Workman, Cpt. East, Sgt. Lundsford, Cpl. Michael Smith, Cpl. K. Turner, Cpl. Velasco, Beck, Lt. Mike Arnold, Sgt. Allen, Dfc. K. Martinez, Cpl. Ochieng, Tate, Lt. Amanda Arnold, Sgt. Malone, Cpl. Corley, McLeland, Rhodes, Lt. Carrier, Phipps, Sgt. Fuller, Dfc. Dersam, and Dfc. Drumright either ordered Plaintiff to continue to be housed in isolation, knowing the conditions of isolation, or carried out those orders knowing about those purportedly unconstitutional conditions. Plaintiff also contends that Defendant Cpl. Mulvaney, because he read and responded to Plaintiff's grievances regarding his conditions of confinement in isolation, was aware of those conditions, but did nothing to intervene. Plaintiff says that he wrote letters to then-Sheriff Helder and Defendants Chief Deputy Cantrell and Major Denzer informing him of his conditions of confinement, but they continued to order that he remain housed in isolation.

(3)  Defendant Cpl. R. Raines repeatedly kicked his cell door at fifteen-minute intervals the night of February 27, 2022, to February 28, 2022. Defendants R. Raines, A. Raines, J. Vandenack, C. Self, D. Nunziato, H. Eoff, K. Martinez, Granados, Drumright, White, Rhodes, McLeland, E. Frye, T. Beck, Higdon, Bilbrey, R. Phipps,

---

[2]    Plaintiff, at times, refers to the defendants by the wrong rank, no rank, their rank at the time he filed the Amended Complaint, or the rank at the time of the events giving rise to Plaintiff's claims. For example, Plaintiff refers to Defendant Ake as "captain." (ECF No. 11, p. 11). When Plaintiff's claims arose, Defendant Ake was one of the four *lieutenants* assigned to the WCDC. (ECF No. 70-13, p. 1). Defendant Ake is *currently* a captain in the Washington County Sheriff's Office ("WCSO"). *Id.* Plaintiff also refers to Defendant Carrier in the Amended Complaint as a *lieutenant*. (ECF No. 11, p. 17). Defendant Carrier, however, was a *sergeant* at the time of the events giving rise to Plaintiff's claims. (ECF No. 70-9, p. 1). In this section, this Court describes the defendants' ranks as Plaintiff has identified them (when he identifies them). Where relevant in the analysis section, this Court notes the change in rank.

Edge; Montano, Dersam, and Vailopulos, followed orders to keep Plaintiff confined in ISO-1 and ISO-4 from March 29, 2022, to May 24, 2022, notwithstanding the purported conditions of those cells. Plaintiff says that "each one of these guards told [him] they'd entered maintenance requests to Sam Caudle and informed their corporals, sergeants and lieutenants of the conditions of [his] confinement," but nothing was corrected. Defendants Nunziato and Vandenack retaliated against him by taking items of contraband from his cell during a shakedown; and Drumright, Dersam, Eoff, Frye, Nunziato, Beck, White, and Martinez "mocked" Plaintiff. *See* (ECF No. 11, pp. 20-22).

Upon preservice review of Plaintiff's Amended Complaint pursuant to 28 U.S.C. § 1915A(a), it was recommended the following claims proceed: (1) Plaintiff's claims against Defendants Bzoski and Ake in their individual capacities for retaliating against him in violation of his First Amendment rights; (2) Plaintiff's claims against Defendants Bzoski and Ake in their individual capacities for ordering Plaintiff to be placed in ISO cells without due process of law; (3) Plaintiff's conditions-of-confinement claims related to his confinement from March 29, 2022, to May 24, 2022 against Defendants Caudle, Cantrell, Denzer, East, Workman, Lunsford, Mike Arnold, Amanda Arnold, Carrier, Pineda, Byrd, Bradshaw, Allen, Malone, Fuller, Mulvaney, Smith, Velasco, Corley, Tate, and Ochieng in their individual capacities. (ECF No. 17). It was recommended that all other claims be dismissed without prejudice, and service of the Amended Complaint was ordered on remaining defendants. (ECF No. 19). Judge Brooks adopted the undersigned's recommendations without objection. (ECF No. 25).

When all but two of the defendants – namely, Defendants Smith and Bradshaw[3] – had answered the Amended Complaint, Defendants were directed to either submit a motion for

---

[3]    The served Defendants reported that they required additional information to effect service on Defendant Smith. (ECF No. 28). Plaintiff provided the necessary information on April 10, 2023, and service was re-issued as to Defendant Smith on April 17, 2023. (ECF Nos. 31, 32).

summary judgment asserting that Plaintiff had failed to properly exhaust his administrative remedies in accordance with 42 U.S.C. § 1997e(a) or promptly inform the Court and parties that Defendants did not intend to pursue an exhaustion defense at trial.   (ECF No. 29).   On April 21, 2023, Defendant Smith filed his Answer.   (ECF No. 34).

On May 15, 2023, all but Defendant Bradshaw – who had not yet been served with the Amended Complaint[4] – filed a motion requesting summary judgment on the issue of exhaustion as to Defendants Cantrell, Denzer, Ake, East, M. Arnold, A. Arnold, Pineda, Workman, Bzoski, Fuller, Byrd, Velasco, Smith, Ochieng, Mulvaney, Tate, Lundsford, and Caudle.   (ECF Nos. 36-38).   Plaintiff was directed to respond by June 6, 2023, and provided instructions on how to respond. (ECF No. 39). When Plaintiff failed to submit his response by that deadline, an order to show cause was issued, (ECF No. 41), prompting Plaintiff to object to Defendants' Motion for Summary Judgment on Exhaustion. (ECF No. 48).   The undersigned then recommended denial of Defendants' Motion for Summary Judgment with respect to Plaintiff's claims against Defendant Mulvaney but granting in all other respects.   (ECF No. 52).   Judge Brooks also adopted those recommendations without objection.   (ECF No. 56).   Consistent with that Order, only Plaintiff's individual capacity claims against Defendants Carrier, Bradshaw, Allen, Malone, Mulvaney, and Corley remain pending:   Plaintiff's conditions-of-confinement claims against Defendants Carrier, Bradshaw, Allen, Malone, Mulvaney, and Corley for his period of confinement in isolation from March 29, 2022, to May 24, 2022.

On March 11, 2024, Defendants filed a Motion for Summary Judgment for Failure to

---

[4]     After multiple service attempts, service was executed on Defendant Bradshaw on September 8, 2023.   (ECF No. 54).

Exhaust Administrative Remedies as to Defendant Bradshaw (ECF No. 60), and Plaintiff objected on April 10, 2024.   (ECF No. 66).   Defendants then filed a Motion for Summary Judgment on the merits, (ECF Nos. 68-70), and on July 25, 2024, Plaintiff objected to this Motion. (ECF No. 78).   The undersigned turns to a consideration of Defendants' Motion for Summary Judgment on Exhaustion as to Defendant Bradshaw and Defendants' Motion for Summary Judgment on the merits of Plaintiff's remaining claims.

## II.    LEGAL STANDARD

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party." *Ward v. Olson*, 939 F. Supp. 2d 956, 961 (D. Minn. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).   A fact is material only when its resolution would affect the outcome of a case. *Anderson*, 477 U.S. at 248.

Further, the moving party bears the initial burden of identifying "those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1085 (8th Cir. 2011) (quoting *Torgerson v. Rochester*, 643 F.3d 1031 (8th Cir. 2011).   In response, the nonmoving party "may not rest upon mere denials or allegations but must instead set forth specific facts sufficient to raise a genuine issue for trial." *Forrest v. Kraft Foods, Inc.*, 285 F.3d 688, 691 (8th Cir. 2002) (citing *Thomas v. Runyon*, 108 F.3d 957, 959 (8th Cir. 1997).   In considering a summary judgment motion, the court views all the evidence and inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255.

## III.    FACTUAL RECORD

Viewing the facts in the light most favorable to Plaintiff, the Court begins its analysis.

### A.  Washington County Detention Center Grievance Policy

The policies of the Washington County Detention Center ("WCDC") allow inmates who claim they were "subjected to abuse or an abridgement of [their] civil rights while being detained" to file a grievance on the WCDC kiosk in their cellblock. (ECF No. 38-5).[5]    According to the WCDC Detention Center Handbook, a grievance "must be submitted within eight hours from the time the event complaint of occurred." *Id.*    Further, the grievance should include:

A.  The date and approximate time of the event
B.  The name(s) of the person(s) involved
C.  The name(s) of any witness(es)
D.  Pertinent details of the event.

*Id.*    Plaintiff does not dispute Defendants' description of the WCDC grievance procedure, and he does not allege the grievance procedure was unavailable to him on the WCDC kiosk system. (ECF No. 66).

From the time Plaintiff was booked into the WCDC on November 18, 2021, until he filed his Amended Complaint on December 27, 2022, Plaintiff submitted hundreds of requests and grievances on the WCDC kiosk system. (ECF No. 60). Upon review of those kiosk submissions, Defendants assert "Plaintiff filed no grievance concerning his conditions of confinement occurring between March 29, 2022, and May 24, 2022, which identified Sgt. Bradshaw."  *Id.*, p. 3.   For his

---

[5]      Pursuant to Fed. R. Civ. P. 10(c), Defendants have incorporated by reference the pleadings and exhibits they submitted in support of their Motion for Partial Summary Judgment for Failing to Exhaust Administrative Remedies.  *See* (ECF No. 60).

part, Plaintiff does not dispute this fact. (ECF No. 66). Instead, Plaintiff says he "was in isolation and did not have the names of all the responsible individuals until long after the 57 days in ISO were over.   Filing a grievance after the fact would've been of no consequence." *Id.*

Importantly, another fact undisputed by Plaintiff is that he did file many grievances during the 57 days between March 29, 2022, and May 24, 2022, while in isolation. (ECF No. 38-3, No. 66).   The following excerpts are only a sample of Plaintiff's kiosk submissions from March 29, 2022, to May 24, 2022, concerning his conditions of confinement in isolation:

April 12, 2022:     This grievance is against, McLeland, Bilbrey, Self, Rhodes, Corley, Drumright, and Dersam, as well as their supervisors for being subjected to ISO-4 which has no ventilation, no working HVAC, is musty and moldy and is swarming with flies nesting and hatching eggs in the detritus built up in the expansion joint in the floor.   The cell gets no fresh air and reaks [sic] of mold, feces, vomit, rotting food and dead bugs. . .. (ECF No. 38-3, p. 4).

April 14, 2022:     There is no HVAC/Ventilation in ISO-4. I reported this problem when I was in ISO-4 March 1-3, I have reported it against numerous times since being in ISO-4 over the last 2 weeks.   The cell seals up tight and gets no fresh air at all, grows mold and mildew, and I suspect that the vents may be where the flies are coming from.   I often find myself letargic [sic] and light-headed and suspest [sic] I may be deprived of oxygen, my cell filling with carbon dioxide.   I have reported this on the kiosk and told all the guards and asked them to put in a maintenance request but the problem continues even after a month and a half.   I am concerned about permanent brain damage from lack of oxygen and may need to be seen by a physician. *Id.*, p. 5.

April 27, 2022:     I am still in ISO-4 which has no ventilation and is foul with odor like a porta potty.   4/25 after dinner Pruitt came in and asked me why it smelled like shit and I showed him the expansion joint full of sewage and showed him that there is no ventilation.   *Id.*, p. 41.

May 2, 2022:       I am being intentionally subjected to a filthy cell with no

fresh air, feces on the walls, rotting food on the bunk and in the corners and a massive fruit fly infestation.  I spent all day cleaning and killing bugs, this is a vilation [sic] of the 8th ammendment [sic]. *Id.*, p. 43.

May 4, 2022:    My cell is rancid and infested with flies. Tonight, at approximately 5:07 Frye and Taylor came to get me for my hour out and commented on the disgusting odor saying it made them want to puke.  I educated them on the 8th ammendment [sic] and their personal liability for violating my rights and the fact that they would be held accountable when I filed my 1983. . ..  *Id.*, p. 45.

May 4, 2022:    . . . I am being subjected to cruel and unusual punishment being kept in a filthy cell that reaks [sic] of feces and vomit and is infested with flies. *Id.*, p. 64.

May 16, 2022:   As I have been reporting since the beginning of March ISO-4 has no HVAC and gets no fresh air or ventilation whatsoever.  I have demonstrated this many times to most of the guards and at least two sargeants [sic] (Carrier and Malone). Today was rather warn and the offgassing of the methane coming from the expansion joints in the floor became stifling, making me nauseated and faint.  If you are going to lock me into an airtight concrete box you need to provide me with fresh air, I am concerned about sustaining a brain injury due to oxygen deprivation. *Id.*, p. 52.

May 19, 2022:   I am being kept in a cell with sewage in the expansion joints of the floor which I have been extracting for weeks now using the limited resources at my disposal.   I also have a fly infestation which requires that I kill them by hand every day. *Id.*, p. 53.

May 19, 2022:    Mulvaney, please save video from ISO-4 on 5/20 at approximately 6:45 AM where I hold up to the camera a piece of yellow paper covered in dead flies that I killed today May 19th.  This is a daily routine and has been for over 5 weeks.   I have mailed these papers to my attorney for safekeeping and would like this video to go along with the papers themselves to serve as evidence of the filthy and unsanitary conditions that I am being subject to in my 1983 lawsuit against those responsible for violating my constitutional rights. *Id.*, p. 77.

9

**B. Conditions of Confinement in isolation from March 29, 2022, to May 24, 2022**

On March 29, 2022, after WCDC personnel observed Plaintiff on video "using a lightbulb he got from N22 to ride around like a horse . . . and . . . 'jumping rope' with electrical wire," Plaintiff was moved to ISO-1.[6]   (ECF No. 70-5, p. 14); (ECF No. 72, N-Blk; 3-28-22; 0700-0730).   On April 1, 2024, Plaintiff was moved to ISO-4.[7]   (ECF No. 70-4, p. 1).   Plaintiff was moved out of isolation and into "M" block on May 24, 2022.   (ECF No. 70-4, p. 4).   Plaintiff's claims concern the conditions of his confinement from March 29, 2022, and May 24, 2022.   *See* (ECF No. 11).

### *Conditions of Plaintiff's Isolation Cells*

There is a significant factual dispute about the conditions in this isolation cells.   Plaintiff describes them as "rancid and bug infested." (ECF No. 11, p. 12). He describes there was "sewage in the floor, [] mold, [] bugs, [and a] lack of fresh air due to the non-functional HVAC system."   *Id*.   Plaintiff asserts that "guards were leaving dirty food trays in [his] cell around the clock

---

[6]    For his part, Plaintiff does not dispute that he was handling a "4-foot glass light bulb right out in the day room on camera," but he claims that he did so to document the security failures at the WCDC and that the Defendants placed him in isolation to retaliate against him for highlighting such failures.   (ECF No. 78).   As noted above, however, Plaintiff's claims against Sgt. Bzoksi and now-Cpt. Ake for retaliating against him by placing him in isolation without due process of law were dismissed without prejudice because Plaintiff failed to exhaust his administrative remedies with respect to these claims before initiating this lawsuit.   (ECF Nos. 17, 25).   Thus, *why* Plaintiff was placed in isolation and *whether* due process was even necessary to justify the move are no longer relevant.   Instead, consistent with the remaining claims, this Court focuses on the conditions of isolation and what role (if any) the defendants played in either creating those conditions or exposing him to them.

[7]    Neither party makes clear whether Plaintiff remained in ISO-4 from April 1, 2022, until he was transferred to "M block" on May 24, 2022.   Plaintiff's housing history suggests that he was transferred back to ISO-1 from at least May 2, 2022, to May 9, 2022.   (ECF No. 70-4, p. 3).   In any event, identifying Plaintiff's specific housing location from March 29, 2022, to May 24, 2022, is not material to the Court's analysis for the reasons described below.

exacerbating [the] bug infestation [in his cell]."  *Id.*, p. 13.

Defendant Mulvaney says "it is the policy to keep the [WCDC] facility as clean as possible. Cells and dayrooms are to be kept clean and sanitary at all times by daily sweeping and mopping. Walls and other surfaces are cleaned as required.  Toilets, sinks, and showers shall be cleaned daily.  Plumbing shall be maintained in good working condition."  (ECF No. 70-1).[8]  To this end, the record illustrates that WCDC contracts with Rid-A-Pest, a pest elimination service, for monthly services and inspections.  (ECF No. 70-8).  Relevant here, Rid-A-Pest performed those services on March 3, 2022, April 7, 2022, and May 4, 2022, and reported each time that there was no rodent activity and provided a "spot treatment" for spiders. (ECF No. 70-8, p. 17, 25, 33). Plaintiff contends, however, that "the pest control people do not come into the cell blocks, cells, and certainly not the ISO cells."  (ECF No. 78, p. 4).

There seems, however, to be no dispute that there were bugs in Plaintiff's cell. Security footage submitted by Defendants reflects Plaintiff using a t-shirt to swipe at (what are likely) insects while housed in isolation. (ECF No. 72, ISO 1; 5-2-22; 0700-0800 Hrs.). Video dated May 3, 2022, shows Plaintiff holding a paper containing crushed bugs to the camera while WCDC officials clean his cell.  (ECF No. 72, ISO 1; 5-3-22; 1300-1320 Hrs.); (ECF No. 72, ISO 1; 5-4-22; 1828-1831 Hrs.) (Plaintiff shows the camera a piece of paper containing crushed bugs).  The

---

[8]    In support of this assertion, Defendant Mulvaney cites "Exhibit A8, Policies and Procedures, page 54."  (ECF No. 70-1, p. 4).  There is no Exhibit A8.  In support of Defendants' Motion for Summary Judgment, the docket reflects Exhibits A, A1-A7, B, C, D, E, and F.  *See* (ECF No. 70).  In any event, Defendant Mulvaney identifies himself as a custodian of records, who is "familiar with the policies and procedures of the jail."  (ECF No. 70-1, p. 1).  Plaintiff does not dispute these facts.  (ECF Nos. 77-78).  Accordingly, the Court views Defendant Mulvaney's statements about the WCDC policies and procedures as based on his own personal knowledge of those policies and procedures.

dispute, rather, appears to concern the degree to which there were bugs in the cell and their root cause.   Defendants assert that "[t]he small bugs that were present in the cell were gnats or fruit flies.   This is likely because [Plaintiff] would consistently hid [sic] food and waste in his cell.   He would also put food waste in the sink of his cell.   The sink is designed more like your bathroom sink and not your kitchen sink with a garbage disposal. The sink in his cell is not intended or designed to have food waste put down the drain.   The gnats and fruit flies where [sic] most likely attracted to the hidden food and improperly disposed of food waste by [Plaintiff]."   (ECF No. 70-13, p. 3).

Plaintiff disputes that he hid food or food waste in his cell. (ECF No. 78, p. 4). But he concedes he "washed the trays off in the sink." *Id.*   Further, security footage of Plaintiff's cell during the relevant time period (March 29, 2022, to May 24, 2022), shows Plaintiff, on at least one occasion, mixing something in a bowl, eating the contents of the bowl, cleaning out the remains of the bowl in the sink, stacking the bowls (and the lids) on the ledge next to his sink, wiping the sink down with a towel, and then covering the sink with the towel.   (ECF No. 72, ISO 4; 4-24-22; 2055-2110 Hrs; Leg Ser #27626245).   On another occasion, video footage shows WCDC officials dropping off a food tray in Plaintiff's cell without retrieving what appears to be a food tray wedged behind Plaintiff's toilet and underneath the sink.   (ECF No. 72, 4-25-22; 0659-0718 Hrs.).   The video also shows Plaintiff eating some of the food on the tray, taking the remaining food off his tray and putting it into a bowl and then placing a lid on the bowl, and then rinsing off the food tray in the sink with a towel.   *Id.*   Plaintiff then takes the tray over to the other side of his cell where he has placed his mattress and other belongings.   *Id.*   Plaintiff appears to then wedge the tray between the wall and his personal belongings, removes a towel from his sink/toilet area, and takes

it over to his bed.   *Id.*   It is not clear whether he is using the towel to cover the tray or using it for some other purpose.   *Id.*   Finally, the video shows him taking the tray that was wedged behind his toilet and placing it directly in front of his cell door.   *Id.*   Another video shows Plaintiff receiving a food tray, eating some of the food, putting some of the food in a bowl with a lid, and leaving the remaining food on the tray, which he then placed under the sink/toilet unit in his cell. (ECF No. 72, ISO 4; 4-26-22; 1242-1252 Hrs.; Leg Serv 2765914); (ECF No. 72, 1SO 4; 5-10-22; 1923-1930 Hrs.) (Plaintiff is rinsing his food tray in his sink).

According to Nolan Ake, who was a lieutenant at the time of the events giving rise to Plaintiff's claims, "[t]he isolation cell has an air vent and there is no indication that it was not working.   Sometimes air is slowed down because a detainee places wet toilet paper over the vents to block the air because they feel it is too hot or cold and are trying to stop the air from flowing." (ECF No. 70-13, pp. 2-3).   During the relevant timeframe (March 29, 2022—May 24, 2022), WCDC's maintenance help desk logs reflect that on April 17, 2022, Defendant Allen reported that "ISO-4 has poor ventilation." (ECF No. 70-6, p. 1).   The maintenance ticket was assigned to Sam Caudle,[9] who closed the ticket on May 3, 2022, with the note: "All dampers are open."   *Id.*   On May 21, 2022, Defendant Malone reported that the "[t]oilet in ISO4 in [sic] leaking.   Water in [sic] collecting in the cracks.   Also very poor air flow from vents.   No obstructions on outside of grate."   (ECF No. 70-6, p. 2).   Caudle closed that ticket on May 23, 2022, noting "[n]o leaks found."   *Id.*   On the same date – May 21, 2022 – Michael Smith reported, "[a]ll the blocks and the individual cells are over hot in A pod. A number of work orders have been submitted on this

---

[9]     Plaintiff's claims against Sam Caudle were dismissed because Plaintiff failed to properly exhaust his administrative remedies with respect to these claims in accordance with 42 U.S.C. § 1997e(a) before initiating this lawsuit.   *See* (ECF Nos. 52, 56).

but the problem remains."   (ECF No. 70-6, p. 2).   Caudle responded the next day, saying "[t]his is the first work order I have received in a while for A pod.   Each block has its own unit.   The warmest block you have at this time is 71 degrees and all units are working properly at this time. Thanks."   *Id.*   Plaintiff disputes that anything was ever done about the HVAC.   (ECF No. 78, p. 7).

The security footage Defendants submitted show Plaintiff's cell being cleaned.[10]   Video dated April 26, 222, shows two officials entering Plaintiff's cell. (ECF No. 72, ISO 4; 4-26-22; 1514-1515 Hrs; Leg Serv 26754914). One has a broom and sweeps Plaintiff's cell.   *Id.*   In doing so, he finds and retrieves a tray that had been left underneath Plaintiff's sink/toilet unit.   *Id.*   The second official then mops the cell and after finishing moping, uses a spray bottle and sprays down the sink/toilet unit with some unknown substance.   *Id.*   Video dated April 27, 2022, shows essentially the same procedure: two officials enter his cell, one removes Plaintiff's food tray (which was sitting on top of the sink/toilet unit) while the other sweeps.   (ECF No. 72, ISO 4; 4-27-22; 0844-0845 Hrs.; Leg Serv 27654914).   After the official concludes sweeping, the second official re-enters the cell and mops the cell.   *Id.*   In this video, however, no one sprayed down the toilet/sink unit.   *Id.*   On May 18, 2022, security footage shows officials removing his food tray,

---

[10]     In support of Plaintiff's response in opposition to Defendants' Motion for Summary Judgment, Plaintiff submitted an affidavit from Brian S. Sutton.   (ECF No. 78-1).   According to Mr. Sutton, he has been "incarcerated at the Washington County Detention Center approximately ten to twelve times between 2015 and 2024."   *Id.*, p. 2.   During that time, he was a trustee twice and had access to and was familiar with ISO cells #1 and #4, "the first time was in 2021 and the second time was in 2023."   *Id.*   According to Mr. Sutton, in 2021, "the ISO cells never got cleaned," but when he "returned in 2023 that practice had changed and [] trustees were required to clean the ISO cells."   *Id.*   Thus, by his own admission, Mr. Sutton was not a trustee during the timeframe in question—March 2022, to May 2022.   Mr. Sutton's affidavit is therefore simply not relevant.   *See* Fed. R. Evid. 401.

sweeping his cell, mopping the cell, searching his property, spraying Plaintiff's sink/toilet unit with an unknown substance, and then leaving.   (ECF No. 72, ISO 4; 5-18-22; 1843-1846 Hrs.). These videos do not capture any obvious "black mold."    But they show a small, narrow gap where two slabs of concrete meet.   It is not possible to see what (if anything) is inside that gap, but in a video dated May 2, 2022, Plaintiff can be seen crouched on the floor digging into this gap with some unidentified instrument and collecting the fruits of his labor in a pile; he can also be seen pouring and splashing water under his bed, to the point where there is water pooling around his bed.  (ECF No. 72, ISO 1; 5-2-22; 0700-0800 Hrs.).   In a video time stamped later that day, Plaintiff can be seen trying to "kick" that water out of his cell; officials subsequently enter his cell with a mop (which Plaintiff uses to mop his cell), a spray bottle (which others use to spray the toilet/sink unit and the walls of the cell), and a dust pan (which Plaintiff uses to rid his cell of what he collected from the gap in the concrete slabs).   (ECF No. 72, ISO 1; 5-2-22; 0900-0920).

### *Scope of Supervisory Authority*

Defendants argue that only officials with the rank of lieutenant or higher had the authority to move Plaintiff from isolation.  (ECF No. 70-13, p. 2). With respect to Defendants Carrier, Bradshaw, Allen, Malone, Mulvaney, and Corley, it is argued that none were lieutenants at the time of the events giving rise to Plaintiff's claims and none had authority to move Plaintiff from isolation. *Id.*   Plaintiff does not dispute this fact.   The parties do dispute the supervisory scope (and role) of the remaining defendants – Carrier, Bradshaw, Allen, Malone, Mulvaney, and Corley – at the time of the events giving rise to Plaintiff's claims.

**Defendant Carrier:**   Regarding Defendant Carrier, Plaintiff says that "Lieutenant Carrier oversaw B-shift operations on many days over [the two months he was in isolation]. DFC Phipps

told [him] over and over that he'd made her aware of the situation."  (ECF No. 11, p. 17).
According to Plaintiff, "he asked [Phipps] to ask [Carrier] to come talk to [him] and on April 22nd
she did."  *Id.*   He says that he "showed her the conditions of her confinement, asked if she could
please do something, either let [him] out or fix the lack of ventilation bugs, mold, sewage, and
leaking fire sprinkler.   She said she would call Sam Caudle, and as [he] mentioned, [Sam Caudle]
did stop by, but nothing ever got fixed."  *Id.*

Defendant Carrier reports that she spoke to Plaintiff when he was in an isolation cell one
time and that he complained to her about "the ventilation, bugs, and mold."  (ECF No. 70-9, p.
1).   According to Defendant Carrier, she "did not feel that there was an air or ventilation problem
in the cell.   The temperature felt normal and [she] had not [sic] problems breathing while [she]
was in the cell."  *Id.*   She saw tiny bugs, which she believed to be gnats, flying around the cell,
but does not recall observing any mold."  *Id.*

**Defendant Bradshaw:**   With respect to Defendant Bradshaw, Plaintiff says that "[a]t 6:00
am on the morning of March 30th, B-shift took over and Sgts. Carlos Pineda, John Byrd, and
Aaron Bradshaw gave the order as directed by Captain Ake to keep [him] in ISO Wednesday 3/30
to Saturday 4/2.   This routine continued for two months." (ECF No. 11, p. 14).

**Defendant Allen:**   According to Plaintiff, "[a]t 6:00 pm on the evening of March 30th D-
shift took over the operations of the jail under Lieutenant Mike Arnold.   Arnold did his briefing,
reviewed [his] placement in ISO and ordered Sergeant Allen to instruct his corporals and floor
guards to keep [him] locked in ISO through Sunday morning April 3rd.   This routine continued
week after week until the end of May."  (ECF No. 11, pp. 14-15).   Plaintiff claims that "Allen
not only gave orders to keep [him] locked in ISO but gave instructions to intensify [his] misery by

16

whatever means possible.   He sicked his pitbull DFC K. Martinez on [him] to shake [him] down constantly, rough [him] up and threaten [him] repeatedly, leave dirty food trays in [his] cell all night week after week."   *Id.*, p. 15.   Plaintiff, moreover, asserts that:

> Allen is also sneaky. When I reported him and made requests to Mulvaney to save video evidence of the Allen/Martinez collaboration, Allen would dip into Mulvaney's inbox and close those requests out so that Mulvaney wouldn't see them and the videos wouldn't get saved.   I took abuse from Allen week after week. One of his favorite things to do was to either deprive me of my hour out of my cell altogether, or to have Corporal Ochieng get me out of bed in the middle of the night once I'd finally passed out from exhaustion.   Then he'd have Ochieng take me into the day room of one of the lockdown blocks long after the kiosk had been shut down and leave me there miserable and tired with nothing to do, nowhere to lay down and sleep and no access to the kiosk, so I couldn't file a grievance against him.   Allen is a psychopath and he tormented me.   He came down to see me one time and heard me out about the bug infestation, the filth, the feces, mold, lack of fresh air, the exacerbation of my misery by Martinez and my fear of being brutalized by him, and Allen smiled, proud of his accomplishment, then he closed the flap on the window and left.

(ECF No. 11, pp. 15-16).

Defendant Allen disagrees, arguing he never intended to "punish" Plaintiff and was never directed to punish him by anyone else.   (ECF No. 70-10, p. 3).   According to Defendant Allen, who is familiar with WCDC policies and procedures, "[d]uring the night shift, [officials] must complete feeding, cleaning, and medication pass in the entire pod before [they] are able to take detainees who are housed alone or on special status, like [Plaintiff] out of their cell for an hour out. This is because those inmates would have to be taken out of the cell and moved temporarily to a pod with an empty dayroom. If the shift was short-handed, the hour out of the cell might be later than normal."   *Id.*, p. 2.

**Defendant Malone:**   Plaintiff says that "[a]t 6:00 am on the morning of April 3rd Lieutenant Amanda Arnold took over, commanding A-shift in operating the jail.   Like the 3 other

lieutenants previously mentioned, she did her assessment and gave the order to keep me locked in ISO that Sunday through Tuesday April 5th Sergeants Malone and Bradshaw took those orders and passed them along to Corley and subsequently to the floor guards."   (ECF No. 11, p. 16).

According to Plaintiff "[he] saw and heard from Malone quite a few times, he's a nice enough guy, but he did force [him] into those nasty ISO cells on more than one occasion, and he gave others orders to do it on many days including, but not limited to 4/3, 4/23, 4/25, 5/1, 5/2, 5/10, and 5/21.   Malone apologized to [him] numerous times for subjecting [him] to cruel and unusual punishment. . .. On May 10th Malone came into ISO-4, witnessed firsthand the filth, bugs, mold, etc. . . .." (ECF No. 11, p. 16).

Defendant Malone says he had no authority to remove Plaintiff from isolation.   (ECF No. 70-11, p. 3).   He says that "[w]hen a lieutenant gives an order for someone to remain in isolation that means they are also in administrative segregation . . . A Sergeant still has to process the report. However, they have no authority to remove the person from isolation or segregation."   *Id.* Defendant Malone asserts that he "did not cause the conditions that [Plaintiff] complains of" and he "[was] not aware of the conditions [Plaintiff] describes."   *Id.*

**Defendant Mulvaney:**    According to Plaintiff, "Corporal Mulvaney, more than any other person knew exactly what [he] was enduring and did nothing to stop it.   He read grievances and watched and saved video of everything described in this complaint day after day.   When he should have been sounding the alarm, he was complicit."   (ECF No. 11, p. 18).

Defendant Mulvaney claims that he functions "as a grievance officer and investigator;" he does not "act as a supervisor for pod deputies or other employees."   (ECF No. 70-1, p. 1).

**Defendant Corley:**    Plaintiff asserts that Corporal Corley "ran the control tower

18

operations on many days including 4/9, 4/12, and 5/3 and on those days ordered guards including Eoff, Vasilopolous, McLeland, Rhodes, and others to keep [him] locked in ISO." (ECF No. 11, p. 17). Plaintiff claims that "[Defendant Corley] sat directly above the ISO cells and had clear view over [him] and [his] conditions. [He] watched in person and on camera hour after hour, day after day as [he] killed bugs and held them up to the camera for him to see." *Id.* Plaintiff says that on "April 9th [he] was complaining about the conditions and asked McLeland to tell Corley and McLeland said 'he knows.' He knew week after week for the next month and a half while [his] cruel and unusual punishment continued, literally while he watched." *Id.*

With respect to all the remaining defendants (i.e., Carrier, Bradshaw, Allen, Malone, Mulvaney, and Corley), Captain Ake,[11] who was a lieutenant at the time and thus familiar with the policies and procedures of the WCDC, asserts they "would have been limited to addressing [Plaintiff's] complaints by cleaning or contacting maintenance, or by reporting to one of the four shift Lieutenants if they felt that the situation was serious and needed to be addressed differently." *Id.*, p. 2.

## IV.    LEGAL ANALYSIS

Two issues before the Court on summary judgment: (1) Whether Defendant Bradshaw is entitled to summary judgment because Plaintiff failed to exhaust his administrative remedies as to him in accordance with 42 U.S.C. § 1997e(a) before initiating this lawsuit (ECF No. 60); and (2) whether the Defendants Carrier, Bradshaw, Allen, Malone, Mulvaney, and Corley are entitled to summary judgment as to the merits of Plaintiff's claims. (ECF No. 68).

---

[11]    Because claims against now-Captain Ake have been dismissed without prejudice, he is no longer a defendant to this action and thus is not identified as such.

**A. Exhaustion**

This Court first considers whether Plaintiff exhausted his administrative remedies as to his claims against Defendant Bradshaw before initiating this action in federal court.

Plaintiff filed suit under 42 U.S.C. § 1983, challenging the conditions of his confinement at the WCDC as unconstitutional. (ECF No. 11). Plaintiff's claims, therefore, are subject to the requirements of the Prison Litigation Reform Act ("PLRA"). *See* 42 U.S.C. § 1997e(a). Pursuant to the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title . . . by a prisoner confined in any jail . . . until such administrative remedies as are available are exhausted." *Id.* The exhaustion requirement is mandatory. *See Chelette v. Harris*, 229 F.3d 684, 688 (8th Cir. 2000). Proper exhaustion under Section 1997e(a) "demands compliance with the agency's deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007).

Here, Defendants assert – and Plaintiff does not dispute – that the applicable WCDC grievance policy requires the following:

> A grievance *must* be submitted within eight hours from the time the event complained of occurred. The grievance should include:
>
> A. The date and approximate time of the event
> B. The name(s) of the person(s) involved
> C. The name(s) of any witness(es)
> D. Pertinent details of the event
>
> All grievances are reviewed by the Jail Administrator or their designee. If you feel your grievance was improperly handled, you *may* appeal to the Sergeant or Lieutenant. (ECF No. 38-5) (emphasis added).

20

The grievance policy is described in the WCDC Detainee Handbook and was made available to WCDC inmates on the WCDC kiosk/tablet system, facts Plaintiff does not contest.  *See* (ECF No. 38-1); (ECF No. 66).    There is not even a dispute about whether Plaintiff exhausted his administrative remedies as to Defendant Bradshaw – he did not.   (ECF No. 62); (ECF No. 66). This does not, however, end the Court's exhaustion analysis.   Rather, the undersigned must consider whether the WCDC administrative remedies were "available" to Plaintiff within the meaning of 42 U.S.C. § 1997e(a).

Pursuant to Section 1997e(a), "[a]s are available" means "capable of use for the accomplishment of a purpose: immediately utilizable . . . accessible." *Miller v. Norris*, 247 F.3d 736, 740 (8th Cir. 2001).   The Supreme Court has recognized "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Ross v. Blake*, 578 U.S. 632, 643 (2016).    First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.*    Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use."   *Id.*    Finally, an administrative procedure is unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644.

For his part, Plaintiff asserts that "[he] was in isolation and did not have the names of all the responsible individuals until long after the 57 days in ISO were over.   Filing a grievance after the fact would've been of no consequence."   (ECF No. 66).   It must be considered whether WCDC grievance procedure was "incapable of use" while Plaintiff was detained in ISO-4.

To be sure, "[a] grievance procedure that requires a prisoner to provide information [such as the name of an aggressor] he does not have *and cannot reasonably obtain* is not a remedy that is 'available' to the prisoner." *Tope v. Fabian*, Case No. 09-cv-0734 (DWF/RLE), 2010 WL 3307351 at * 11 (D. Minn. July 29, 2010) (citing *Brown v. Sikes*, 212 F.3d 1205, 1207-08 (11th Cir. 2000)) (emphasis in the original), *report and recommendation adopted by* 2010 WL 3307354 (D. Minn. Aug. 19, 2010).  But Plaintiff concedes, (ECF No. 66), and the record shows (ECF No. 38-3, pp. 4, 5, 41, 43, 45, 64, 52, 53, 77), that Plaintiff submitted several grievances while detained in isolation.  Even if, as Plaintiff seems to suggest, he did not know Defendant Bradshaw's name, he could have (but did not) submit a grievance requesting this information.[12]  Plaintiff suggests that because he was in isolation, he did not have access to the WCDC kiosk/tablet system during the relevant time period – eight hours of the event giving rise to the grievance – to timely submit a grievance.  *Cf. Smith v. Andrews*, 75 F.4th 805, 809 (8th Cir. 2023) (citing *Rucker v. Giffen*, 997 F.3d 88, 94 (2d Cir. 2021) (concluding that "grievance procedures were 'incapable of use'" because plaintiff was hospitalized "for over a month," but "any failure to file a grievance within five days . . . would render it untimely")).  Considering the other grievances, the Court is not persuaded but instead finds that the WCDC administrative grievance procedure was "available" to Plaintiff, he simply did not follow it with respect to his grievance against Bradshaw.

Accordingly, Defendants' Motion for Summary Judgment for Failure to Exhaust Administrative Remedies as to Defendant Bradshaw (ECF No. 60) should be **GRANTED**.  The

---

[12]    If Plaintiff had filed a grievance requesting Defendant Bradshaw's name so that he could timely submit a grievance about Defendant Bradshaw's purported role in creating his conditions of confinement, but WCDC staff resisted or refused to respond to that request, this Court's analysis on whether the WCDC grievance procedure was "as available" to Plaintiff may well have come out differently.

22

undersigned recommends that Plaintiff's claims against Defendant Bradshaw be **DISMISSED WITHOUT PREJUDICE**.  *See Porter v. Sturm*, 781 F.3d 448, 452 (8th Cir. 2015) (dismissal without prejudice is mandatory where plaintiff failed to properly exhaust his administrative remedies in accordance with 42 U.S.C. § 1997e(a)).

### B.  Conditions of Confinement

Turning to the substance of Plaintiff's allegations, Plaintiff claims that the conditions of his confinement violated his constitutional rights.   Because Plaintiff was a pretrial detainee at the time, the Fourteenth Amendment applies to his claims.   Under the Fourteenth Amendment, "a pretrial detainee's constitutional rights are violated if the detainee's conditions of confinement amount to punishment."  *Morris v. Zefferi*, 601 F.3d 805, 809 (8th Cir. 2010) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)).

There are two ways to determine whether conditions of confinement rise to the level of punishment.   First, "a plaintiff could show that the conditions were intentionally punitive." *Stearns v. Inmate Servs. Corp.*, 957 F.3d 902, 907 (8th Cir. 2020) (quoting *Bell*, 441 U.S. at 538). Alternatively, "if there is no expressly demonstrated intent to punish, the plaintiff could also show that the conditions were not reasonably related to a legitimate government purpose or were excessive in relation to that purpose." *Id.* (quoting *Bell*, 441 U.S. at 538-39).   In considering conditions of confinement claims, courts view the "totality of the circumstances of [plaintiff's] confinement and not any particular condition in isolation." *Stearns*, 957 F.3d at 909.

Only Plaintiff's individual capacity claims against Defendants Carrier, Allen, Malone, Mulvaney, and Corley for conditions of confinement remain pending.   Individual liability under section 1983 "requires a causal link to, and direct responsibility for, the deprivation of rights."

*Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006) (quoting *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990)).  The theory that a supervisor is responsible for the torts of his subordinates – vicarious liability – does not apply to § 1983 cases.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  Instead, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Id.*  Put differently, "each Government official, his or her title notwithstanding, is liable only for his or her misconduct."  *Id.* at 677.

Here, Defendants Carrier, Allen, Malone, and Mulvaney each contend they are entitled to qualified immunity. (ECF No. 68). "Qualified immunity protects government officials from liability for civil damages in their individual capacities if their conduct did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known." *Marsh v. Phelps Cnty.*, 902 F.3d 745, 754 (8th Cir. 2018) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  "Government officials are entitled to qualified immunity unless (1) the plaintiff has asserted a violation of a constitutional right; (2) the alleged right is clearly established; and (3) there exists a genuine issue of material fact as to whether the official would have known that his alleged conduct would violate the plaintiff's clearly established right." *Id.* (citing *Smithson v. Aldrich*, 235 F.3d 1058, 1061 (8th Cir. 2000)).  Further, "[w]hen a supervising official who had no direct participation in the alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff provides that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." *Id.* (quoting *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015)).

Here, the court need not reconcile whether Plaintiff's conditions of confinement amounted to a *constitutional* violation under the Fourteenth Amendment because, for reasons explained below, there is no material fact dispute that none of the defendants are responsible (either directly or as supervisors) for those conditions. Because qualified immunity is personal, the undersigned addresses each defendant's alleged conduct independently. *See id.*

### Sgt. (now Lt.) Carrier

While Plaintiff identifies Defendant Carrier as a lieutenant, (ECF No. 11), Defendant Carrier explains (and Plaintiff does not dispute) that she is *currently* a lieutenant but was a sergeant at the time of the events giving rise to Plaintiff's claims. (ECF No. 70-9). There is no fact dispute, moreover, that Sgt. Carrier was not then personally responsible for maintaining the WCDC HVAC system. *Id.* Similarly, Defendant Carrier was not directly responsible for serving Plaintiff food, removing his food tray from his cell, and/or cleaning his cell. Plaintiff asserts liability on the basis that Defendant Carrier was a supervisor, was aware of his conditions of confinement and spoke to him about the conditions but did nothing to remedy them. (ECF No. 11, p. 17).

To be specific, Plaintiff says he showed Defendant Carrier the conditions of his confinement, and "asked if she could please do something, either let [him] out or fix the lack of ventilation, bugs, mold, sewage, and leaking fire sprinkler." (ECF No. 11, p. 17). Plaintiff, however, has not asserted any facts suggesting that Defendant Carrier supervised employees responsible for maintaining the ventilation system or employees charged with addressing bugs, mold, sewage, or a leaking fire sprinkler. Plaintiff's claims against Defendant Carrier are subject to dismissal for that reason.

And even if the "B-shift" officials Defendant Carrier supervised were responsible for

addressing bugs, mold, and sewage in individual cells and failed to do so, to overcome qualified immunity, it is not enough that Defendant Carrier was on notice of the alleged unconstitutional conduct. Rather, Plaintiff must "present sufficient evidence that [the supervisory defendant] acted with deliberate indifference to [his] rights." *Krigbaum*, 808 F.3d at 341. "[D]eliberate indifference is a subjective standard that 'entails a level of culpability equal to the criminal law definition of recklessness.'" *Id.* (quotation omitted). "Plaintiffs must provide [the supervisory defendant] *personally knew* of the constitutional risk posed by [his] inadequate training or supervision" of the offending officials. *Id.* Plaintiff has not satisfied this burden of proof.

Defendant Carrier spoke with Plaintiff his concerns about the conditions of his cell but did not share his concerns: "[she] did not feel that there was an air or ventilation problem in the cell. The temperature felt normal and [she] had not [sic] problems breathing while in the cell." (ECF No. 70-9, pp. 1-2). Defendant Carrier did not recall seeing any mold. *Id.*, p. 2. While she observed tiny bugs in the cell, she attributed those bugs to the belief that Plaintiff kept food in his cell. *Id.* Accordingly, Defendant Carrier could not be deliberately indifferent to train or supervise her subordinates – "B" shift personnel – when she did not believe they had failed to adequately perform their responsibility to clean Plaintiff's cell based on her own personal observations of the cell conditions. Defendant Carrier is thus entitled to qualified immunity and the claims against her should be dismissed with prejudice.

### *Sgt. Allen*

Defendant Allen, like Defendant Carrier, was a sergeant at the time of the events giving rise to Plaintiff's claims. As such, it is undisputed that Defendant Allen did not have the authority to order Plaintiff to be housed in isolation, nor did he have the authority to override or ignore such

orders.    Defendant Allen cannot be liable under § 1983 for executing those orders.    *See Mayorga*,

442 F.3d at 1132 (supervisory defendants not personally liable under § 1983 because they did not

have the authority to override the decisions of the parole board).

Plaintiff claims that Defendant Allen was aware of the conditions of his confinement,

specifically the "bug infestation, the filth, the feces, the mold, and the lack of fresh air," (ECF No.

11, pp. 15-16), but Defendant Allen did not adequately address those conditions.    There are no

facts in the record, however, establishing that Defendant Allen was responsible for supervising or

that he supervised others responsible for the alleged lack of fresh air in the cell or those charged

with handling pest control at the WCDC.    Defendant Allen cannot be liable under § 1983 (either

directly or as a supervisor) for those conditions.

Plaintiff asserts (and Defendant Allen does not dispute) that Defendant Allen supervised

Dfc. Martinez and that at Defendant Allen's direction, Dfc. Martinez would "shake [him] down

constantly, rough [him] up and threaten [him] repeatedly, leave dirty food trays in [his] cell week

after week."    *Id.*    Plaintiff also suggests that Defendant Allen supervised Cpl. Ochieng, who,

again at Defendant Allen's direction, would "get [him] out of bed in the middle of the night once

[he'd] finally passed out from exhaustion."    *Id.*    According to Plaintiff, Cpl. Ochieng would "take

[him] into the dayroom of one of the lockdown blocks long after the kiosk had been shut down

and leave [him] there miserable and tired with nothing to do, nowhere to lay down and sleep and

no access to the kiosk, so [he] couldn't file a grievance against him."    *Id.*[13]    Finally, Plaintiff

---

[13]    Plaintiff's claims against Dfc. Martinez were dismissed without prejudice upon preservice review pursuant to 28 U.S.C. § 1915A(b)(1). *See* (ECF Nos. 17, 25).    Plaintiff's claims against Cpl. Ochieng were dismissed without prejudice because Plaintiff failed to exhaust his administrative remedies with respect to those claims before initiating this action in accordance with 42 U.S.C. § 1997e(a).    *See* (ECF Nos. 52, 56).

claims that Defendant Allen would close his requests to save video, and thus the video would not get saved.

The fundamental problem with these claims against Defendant Allen is that they are conclusory. Plaintiff asserts that Dfc. Martinez and Cpl. Ochieng acted at the direction of Defendant Allen, but Plaintiff asserts no facts supportive of these conclusions. Similarly, while Plaintiff claims that Defendant Allen deleted requests to save certain videos, Plaintiff can offer no facts in support. Once Defendants moved for summary judgment, Plaintiff "was required to discard the shielding cloak of formal allegations and meet proof with proof by showing a genuine issue of material fact." *Fatemi v. White*, 775 F.3d 1022, 1046 (8th Cir. 2015) (quoting *Pace v. Portfolio Recovery Assoc.*, 512 F. App'x 643, 645 (8th Cir. 2013) (per curiam)). Plaintiff claims Defendant Allen directed Dfc. Martinez and Cpl. Ochieng to "punish" him but Defendant Allen's affidavit disputes this allegation, (ECF No. 70-10), shifting the burden to Plaintiff to provide evidence establishing a genuine issue of material fact for trial. *See Wilson v. Miller*, 821 F.3d 963, 970 (8th Cir. 2016) (at summary judgment plaintiff must substantiate her allegations with sufficient probative evidence). Plaintiff has not done so – he has provided no evidence which would tend to explain why or how he came to believe that Defendant Allen deleted his video requests and/or directed Dfc. Martinez and Cpl. Ochieng to punish him. Accordingly, Defendant Allen is entitled to summary judgment.

### *Cpl. Malone*

Corporal Malone also held the rank of sergeant at the time of the events giving rise to Plaintiff's claims. (ECF No. 70-11, p. 1). Plaintiff asserts (and Defendants do not dispute) that Defendant Malone either placed him in isolation himself or directed others to place him in isolation

on "4/3, 4/23, 4/25, 5/1, 5/2, 5/10, and 5/21." (ECF No. 11, p. 16). It is further undisputed, however, that in doing so, Defendant Malone was following the orders of his lieutenant. (ECF No. 70-11, p. 3). Defendant Malone did not personally order Plaintiff to be placed in isolation.[14] Thus, even if the order placing Plaintiff in isolation violated his constitutional rights (and the Court need not reach this question), Defendant Malone, who had no authority over this decision, was not responsible for it. *See Mayorga*, 442 F.3d at 1132.

There are no facts suggesting that Defendant Malone was personally responsible for maintaining the WCDC HVAC system or cleaning Plaintiff's individual isolation cell. There are no facts – disputed or otherwise – suggesting that Defendant Malone supervised the officials responsible for the WCDC HVAC system. To the extent that Defendant Malone was responsible for supervising the officials charged with cleaning his cell, Plaintiff has again failed to "present sufficient evidence that [Defendant Malone] acted with deliberate indifference to [his] rights." *Krigbaum*, 808 F.3d at 341. "To be deliberately indifferent, an 'official must both be aware of facts from which the inference could be drawn that a substantial risk of [unconstitutional] harm exists, and he must also draw that inference." *Id.*

To be sure, there is a factual dispute about the conditions of Plaintiff's cell. Defendant Malone says he listened to Plaintiff's complaints about the conditions of his cell, and observed those conditions but did not share Plaintiff's concerns. (ECF No. 70-11, p. 3). Specifically, Defendant Malone says that while he "observed a small amount of water in the floor," he did not smell sewage and the "source of the water was not known to [him]." *Id.* Further, Defendant

---

[14]    According to Defendant Malone, at one point, he moved Plaintiff from one isolation cell to another, but he did not have authority to move Plaintiff out of isolation. *See* (ECF No. 70-11, p. 4).

Malone says that he "did not observe the cell to be any more or less ventilated than any other part of the facilitate where detainees are housed," and he did not observe filth, mold, or bugs in the cell. *Id.*

Nevertheless, this factual dispute is immaterial because it is undisputed that Defendant Malone did not act with deliberate indifference to Plaintiff's complaints. Despite asserting having no personal knowledge of officials failing to properly clean Plaintiff's cell, Defendant Malone claims – and Plaintiff does not dispute – that he "recalls repeatedly instructing deputies to ensure [Plaintiff's] cell was cleaned to the highest extent possible," and that [Malone] "saw to the cleaning the cell personally when he made his claims to [him], despite the conditions not being as he claimed." (ECF No. 70-11, pp. 4-5). There is no evidence in the record to suggest that despite taking these steps, Defendant Malone nonetheless subjectively believed that the deputies he supervised would not follow his orders and therefore, Defendant Malone posed a *substantial* risk of unconstitutional harm to Plaintiff. Defendant Malone is therefore entitled to qualified immunity.

### *Corporal Mulvaney*

It is undisputed that Corporal Mulvaney is not personally responsible for maintaining the WCDC HVAC system or cleaning individual cells. Further, Defendant Mulvaney is not a supervisor. (ECF No. 70-1, p. 1). Thus, Defendant Mulvaney cannot be liable under § 1983 for a "failure to supervise or train" because he owed no duty to supervise or train other officials. *See Krigbaum*, 808 F.3d at 341 (defendant cannot be "deliberately indifferent in failing to satisfy a duty he did not know he had").

Plaintiff seeks to attach § 1983 liability to Defendant Mulvaney because he "more than any

other person knew exactly what [Plaintiff] was enduring and did nothing to stop it.  He read grievances and watched and saved video of everything described in this complaint day after day. When he should've been sounding the alarm, he was complicit."  (ECF No. 11, p. 18).  This Court views Plaintiff's claim as asserting that Defendant Mulvaney had a duty to intervene.  Such a duty, to the extent one exists, was not "clearly established" at the time of the events giving rise to Plaintiff's claims.  Defendant Mulvaney is therefore entitled to qualified immunity.

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Thurmond v. Andrews*, 972 F.3d 1007, 1012 (8th Cir. 2020) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).  Federal courts "do not define clearly established law at a high level of generality."  *Id.* (quoting *Dillard v. O'Kelley*, 961 F.3d 1048, 1052 (8th Cir. 2020) (en banc)).  "Rather [courts] look for a controlling case or a robust consensus of persuasive authority. There need not be a prior case directly on point, but 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Dillard*, 961 F.3d at 1052)).

It is clearly established that "an officer who fails to intervene to prevent the unconstitutional use of excessive force by another officer may be held liable for violating the Fourth Amendment."  *Nance v. Sammis*, 586 F.3d 604, 612 (8th Cir. 2009).  This, however, is not an excessive use of force case.  Plaintiff does not assert that any officials used force against him.  Indeed, he claims no physical injury.  A close and careful review of the case law, moreover, reveals no case (controlling or otherwise) establishing a duty to intervene in cases such as this one where Plaintiff alleges that the conditions of his confinement violate his constitutional rights, particularly where, as here, Plaintiff does not allege any physical injury stemming from those

31

conditions, and there is ample, uncontroverted evidence in the record that officials cleaned Plaintiff's cell, albeit not to his satisfaction.  Plaintiff's claims against Defendant Mulvaney should therefore be dismissed with prejudice. [15]

### *Corporal Corley*

Plaintiff's claims against Defendant Corley center on Defendant Corley's purported failure to relieve Plaintiff of his conditions of confinement.  Specifically, Plaintiff asserts that Defendant Corley ordered him to be locked in ISO on (at least) 4/9, 4/12, and 5/3.  (ECF No. 11, p. 17).  It is undisputed, however, that Defendant Corley did not personally order Plaintiff to be housed in an isolation cell.  Recall instead – lieutenants issued those orders.  Accordingly, Defendant Corley, like Defendant Malone, was not responsible for the decision to place Plaintiff in isolation and cannot be held liable for it under § 1983.  *See Mayorga*, 442 F.3d at 1132.

Plaintiff further claims that Defendant Corley was aware of the "bug" problem in his cell. (ECF No. 11, p. 17).  He specifically asserts that "[Defendant Corley] watched in person and on camera hour after hour, day after day as [he] killed bugs and held them up to the camera for him to see."  *Id.*  Plaintiff says that on April 9, 2022, "[he] was complaining about the conditions and asked McLeland to tell Corley and McLeland says 'he knows.'"  *Id.*  Plaintiff's generalized assertion that Defendant Corley was aware of the bugs in his cell, however, does not establish that Defendant Corley had the authority to request that the pest extermination company conduct a

---

[15]    Notably, Defendant Mulvaney is not liable under § 1983 simply for responding to (and denying) Plaintiff's grievances. *Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993) ("A prison grievance procedure is a procedural right only, it does not confer any substantive rights upon the inmates.  Hence, it does not give rise to a protected liberty interest requiring the procedural protections envisioned by the fourteenth amendment.") (quoting *Azeez v. DeRobertis*, 568 F. Supp. 8, 10 (D.N.Ill. 1982)).

service visit at the WCDC (or in his housing unit) or that he supervised officials charged with that responsibility.

Further, to the extent that Plaintiff claims Defendant Corley supervised the officials responsible for cleaning his cell and removing his food trays and Defendant Corley's failure to properly supervise those officials is what caused the "bug problem" in his cell, Plaintiff has failed to establish that Defendant Corley was deliberately indifferent to his constitutional rights. As noted above, deliberate indifference is a "rigorous standard," requiring proof "that the supervisor had notice of a pattern of conduct by the subordinate that violated a clearly established constitutional right." *Davis v. Buchanan Cnty., Mo.*, 11 F.4th 604, 624 (8th Cir. 2021) (quoting *Krigbaum*, 808 F.3d at 340)).

The record before the Court plainly shows that officials swept and mopped Plaintiff's cell, albeit not to Plaintiff's satisfaction. (ECF No. 72, ISO 4; 4-26-22; 1514-1515 Hrs; Leg Serv 26754914). It is undisputed that Plaintiff rinsed his food trays in the sink in his cell and he stored food in his cell. (ECF No. 72, 4-25-22; 0659-0718 Hrs.).[16] On this record, it cannot be said that Defendant Corley was "on notice" that his subordinate's failure to properly clean Plaintiff's cell caused the purportedly unconstitutional condition of confinement, considering that Plaintiff's own activities likely contributed to the problem. *Id.* ("A supervisor's mere negligence in failing to detect and prevent a subordinate's conduct is not enough for liability under Section 1983.") (quoting *Ripson v. Alles*, 21 F.3d 805, 809 (8th Cir. 1994)). Defendant Corley should therefore

---

[16]   It is, quite frankly, irrelevant whether Plaintiff was intending to "hide" food by storing it in his cell where, as here, it appears undisputed (or there is uncontroverted evidence in the record indicating) that Plaintiff stored food in his cell.

be entitled to qualified immunity.[17]

There being no remaining claims against any remaining defendant, this matter should therefore be dismissed.

## V.    CONCLUSION

For these reasons, **IT IS RECOMMENDED THAT**

(1)    Defendants' Motion for Summary Judgment for Failure to Exhaust Administrative Remedies as to Defendant Bradshaw (ECF No. 60) be **GRANTED** and Plaintiff's claims against Defendant Bradshaw **DISMISSED WITHOUT PREJUDICE**.

(2)    Defendants' Motion for Summary Judgment on the merits (ECF No. 68) be **GRANTED** and Plaintiff's claims against Defendants Carrier, Allen, Malone, Mulvaney, and Corley in their individual capacities **DISMISSED WITH PREJUDICE**, and this matter be **CLOSED**.

**The parties have fourteen days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the**

---

[17]    Because the Court finds that it is uncontroverted that none of the defendants were responsible (either directly or as supervisors) for Plaintiff's purportedly unconstitutional conditions of confinement, this Court need not reach the question of whether the conditions themselves were unconstitutional.  That said, the Court doubts that the conditions at issue give rise to a constitutional concern considering that the uncontroverted record shows WCDC officials sweeping and mopping Plaintiff's individual cell, spraying the toilet/sink unit, and removing food trays.  While Plaintiff was clearly not satisfied with these efforts and these efforts also plainly did not eliminate the bugs in Plaintiff's cell, "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Krigbaum*, 808 F.3d at 341-42 (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)).

34

**district court.**

       **STATUS OF REFERRAL: No longer referred.**

       **RECOMMENDED** this 2nd day of October 2024.


                             *Christy Comstock*
                             CHRISTY COMSTOCK
                             UNITED STATES MAGISTRATE JUDGE